**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA; FORT WORTH CHAMBER OF COMMERCE; LONGVIEW CHAMBER OF COMMERCE; AMERICAN BANKERS ASSOCIATION; CONSUMER BANKERS ASSOCIATION; and TEXAS ASSOCIATION OF BUSINESS, | |
| Plaintiffs, | Case No. 4:24-CV-213 |
| v. | |
| CONSUMER FINANCIAL PROTECTION BUREAU; and ROHIT CHOPRA, in his official capacity as Director of the Consumer Financial Protection Bureau, | |
| Defendants. | |

**COMPLAINT**

Plaintiffs, the Chamber of Commerce of the United States of America, Fort Worth

Chamber of Commerce, Longview Chamber of Commerce, the American Bankers Association,

the Consumer Bankers Association, and Texas Association of Business, bring this action for

declaratory and equitable relief against Defendants, the Consumer Financial Protection Bureau

("CFPB") and Rohit Chopra in his official capacity as Director of the CFPB. Plaintiffs challenge the CFPB's new rulemaking on credit card late fees ("Final Rule" or "Rule").[1]

Among other things, the Final Rule—which implements a State of the Union promise the President made before the public-comment period had even commenced—slashes by 75 percent the safe harbor amount that the Federal Reserve Board of Governors (the "Board") set for credit card late fees, which every CFPB director has since maintained. The Rule, which upends more than a decade of regulations, is unlawful. Its promulgation by the CFPB, moreover, violated the Appropriations Clause.

The concept of attaching consequences to the failure to pay an obligation is ubiquitous in our legal system. Credit card obligations are no different: Congress has recognized that credit card late fees appropriately serve three commonsense, important purposes: deterring late payments, accounting for cardholder conduct, and compensating credit card issuers for the costs they incur when payments are late. *See* 15 U.S.C. § 1665d(c). Congress also expressly authorized penalty fees for late payments and directed the Board—and now the CFPB—to take each of these criteria into account when ensuring that such fees are reasonable and proportional to the omission or violation of the credit card agreement. *Id*. § 1665d(b)-(c).

The CFPB, however, has now apparently decided that such penalty fees are "junk fees" and has instead limited issuers to collecting late payment fees that compensate them only for a subset of their costs. This is a sharp break both from the statute and from more than ten years of

---

[1] CFPB, Credit Card Penalty Fees (Regulation Z) (released Mar. 5, 2024), https://files.consumerfinance.gov/f/documents/cfpb_credit-card-penalty-fees_final-rule_2024-01.pdf. The Final Rule, which has not yet been published in the Federal Register, was released to the public on March 5, 2024. *See* CFPB, *CFPB Bans Excessive Credit Card Late Fees, Lowers Typical Fee from $32 to $8* (Mar. 5, 2024), https://www.consumerfinance.gov/about-us/newsroom/cfpb-bans-excessive-credit-card-late-fees-lowers-typical-fee-from-32-to-8/.

regulations interpreting it. In taking these actions, the CFPB violated the Appropriations Clause, exceeded its statutory authority, and offered deficient analysis and reasoning, all in order to achieve a pre-ordained outcome that will ultimately harm those consumers the CFPB is charged with protecting. To top it off, the CFPB adopted an effective date that violates yet another statute and that exposes issuers to immediate and irreparable harm. This Court should vacate the Final Rule.

## INTRODUCTION

1.      Nearly five in six adults in the United States have a credit card.[2] Consumer credit cards play an important and valuable role in Americans' lives, allowing consumers to manage their budgets over time, cover unexpected expenses, and participate fully in the economy by paying for anything, almost anywhere in the world, at zero interest when paid timely. Credit cards also afford consumers an opportunity to build credit history, which expands their access to other credit products, such as auto loans and home mortgages. Congress has found that the informed use of credit enhances economic stabilization. 15 U.S.C. § 1601(a).

2.      The credit card market is competitive.[3] In total, more than 3,900 banks and credit unions issue credit cards.[4] Because of the number of options, and because consumers can switch from one card to another with ease, card issuers compete fiercely over price (*e.g.*, interest rates

---

[2] Bd. of Governors of the Fed. Rsrv. Sys., *Economic Well-Being of U.S. Households in 2022*, at 44 (May 2023), https://www.federalreserve.gov/publications/files/2022-report-economic-well-being-us-households-202305.pdf.

[3] *See generally* Daniel Grodzicki, *The Evolution of Competition in the Credit Card Market* (June 27, 2023), https://ssrn.com/abstract=4493211.

[4] *See* Am. Bankers Ass'n et al., Comment Letter on Notice of Proposed Rulemaking 30 (May 3, 2023), available at https://www.regulations.gov/comment/CFPB-2023-0010-0192.

and fees), account features (*e.g.*, online tools, early access to event tickets, and concierge services), and rewards (*e.g.*, cash back and airline miles).

3.      Even in such a competitive market, most card issuers find it prudent to charge cardholders a late fee for failing to make a minimum payment on time. Regular, periodic payments are a defining feature of credit cards for both issuers and consumers—the Office of the Comptroller of the Currency considers regular payments a matter of safety and soundness for card-issuing banks,[5] and timely payment is the hallmark of a customer relationship that is built for long-term success. Late fees encourage timely payments, which in turn help card issuers both to manage credit risk and to lower costs, allowing them to offer more competitive terms and features to broader segments of the population.

4.      In 2009, Congress enacted the Credit Card Accountability Responsibility and Disclosure ("CARD") Act. The CARD Act includes a series of provisions governing credit card terms and conditions, one of which requires that "any penalty fee"—including a late fee—"be reasonable and proportional to [the] omission or violation" of the credit card agreement. Pub. L. No. 111-24, § 102(b)(1), 123 Stat. 1734, 1740 (2009) (codified as amended at 15 U.S.C. § 1665d(a)). Congress delegated to the Board, and later to the CFPB, the duty "to establish standards for assessing whether the amount of any penalty fee . . . is reasonable and proportional to the omission or violation." 15 U.S.C. § 1665d(b). In setting those standards, the CFPB must consider, among other things, the deterrent effect of a late fee, the conduct of the cardholder, and the costs card issuers incur because of late payments. *See id.* § 1665d(c). Congress thus recognized that, for these penalty fees to be effective, they must be sufficient to deter late

---

[5] *See* Off. of the Comptroller of the Currency, *Comptroller's Handbook: Credit Card Lending* 97-98 (Apr. 2021), https://www.occ.treas.gov/publications-and-resources/publications/comptrollers-handbook/files/credit-card-lending/pub-ch-credit-card.pdf.

payments, account for the conduct of late payments by consumers, and compensate card issuers for the costs incurred from late payments.

5.      Under the regulations that the Board promulgated in 2010, which the CFPB later adopted, a late fee of $30 is currently presumed to be "reasonable and proportional to the omission or violation" and thus lawful—enough to discourage and account for tardiness and help cover increased costs. That safe harbor amount increases to $41 for subsequent late payments made within six billing cycles, reflecting the common-sense notion that higher late fees are appropriate for consumers at higher risk of missing a due date.[6] In no event may the late fee exceed the amount of the minimum payment that was due. Both safe harbor amounts have been adjusted periodically for inflation in order to maintain their effectiveness. Periodic inflationary adjustments are consistent with the practice of the CFPB and other prudential bank regulatory agencies, who regularly adjust a variety of regulatory thresholds, including civil penalties, for inflation.[7]

6.      The Final Rule seeks to rewrite the CARD Act in order to achieve a headline-grabbing result: a 75 percent reduction in late fees. To do so, it drops the late-fee safe harbor amounts to $8 for issuers with at least one million open cardholder accounts (hereafter "larger issuers" or "issuers"). This rule effectively denies issuers the ability to do the very thing that Congress permitted them to do—charge a reasonable and proportional penalty fee for late payments, one that accounts for deterrence, the conduct of the cardholder, and costs to the issuer.

---

[6] To account for inflation, the Final Rule increases these amounts to $32 and $43, respectively, for what it terms "Smaller Card Issuers." Final Rule 4, 159-60.

[7] *See* Off. of Mgmt. & Budget, Exec. Off. of the President, OMB Memorandum No. M-23-05, *Implementation of Penalty Inflation Adjustments for 2023, Pursuant to the Federal Civil Penalties Inflation Adjustment Act Improvements Act of 2015*, at 4 (Dec. 15, 2022), https://www.whitehouse.gov/wp-content/uploads/2022/12/M-23-05-CMP-CMP-Guidance.pdf.

Moreover, the CFPB removes any adjustments for inflation for Larger Card Issuers (notwithstanding that such a change is inconsistent with the policy for Smaller Card Issuers and for the federal government itself), thereby ensuring that the $8 late fee will be even less effective in the future.

7.      This dramatic change is not consistent with the statutory text, and it was not the product of reasoned decision-making. Rather, it is part of a rushed and predetermined effort by President Biden to cap and eliminate a host of unpopular "junk fees." (Late fees—which consumers largely know about and accept as appropriate—have been wrongly lumped together with true junk fees, which take consumers by surprise and serve little purpose beyond generating revenue.) And instead of calibrating its regulations based on the statute, the CFPB crafted a rule that would allow the President to make good on his promise to "cut[] credit card late fees by 75 percent, from $30 to $8."[8]

8.      The result is a Final Rule that, if allowed to go into effect, will prevent card issuers from being able to collect the penalty fees that the statute authorizes them to collect for late payments, making credit cards less competitive and less accessible, undermining the separation of powers between the legislative and the executive branches, and ultimately harming consumers. Indeed, the CFPB itself acknowledges that cardholders who pay on time will receive little to no benefit from the Rule, and that they may in fact be harmed by it. This is because the Rule may force issuers to raise minimum payments, annual fees, or APRs; lower credit limits; or offer fewer rewards. *See* Final Rule 60-61. Even cardholders who sometimes pay late may be harmed to the extent the Rule forces card issuers to limit credit offerings to consumers who

---

[8] White House, *State of the Union Address* (Feb. 7, 2023), https://www.whitehouse.gov/state-of-the-union-2023/.

present a higher credit risk or leads cardholders to make additional late payments and expose

themselves to the negative consequences, such as reduced credit scores. *See id*. at 15 (noting that

"if a consumer does not make at least the minimum payment due for more than one billing cycle,

non-payment may carry more severe consequences," and that "[a]fter approximately 30 days,

consumers' credit scores may decline after issuers report the delinquency to credit bureaus"). The

Final Rule should be enjoined and vacated.

## PARTIES

9.       Plaintiff Chamber of Commerce of the United States of America ("U.S.

Chamber") is the world's largest business federation. It represents approximately 300,000 direct

members and indirectly represents the interests of more than 3 million companies and

professional organizations of every size, in every industry sector, and from every region of the

country. An important function of the U.S. Chamber is to represent the interests of its members

before Congress, the executive branch, and the courts. The U.S. Chamber has as members

numerous institutions that issue credit cards, including some of the nation's largest depository

institutions and smaller depository institutions. The Chamber also has as members numerous

retail institutions that offer store-branded credit cards and other consumer financial products.

Many of these members are adversely affected by the challenged regulations.

10.       Plaintiff Fort Worth Chamber of Commerce ("Fort Worth Chamber") is a

voluntary business association that brings the Fort Worth region together to identify issues, solve

problems, and help align resources resulting in a stronger business climate and greater economic

prosperity. Part of its mission includes representing its members in various government settings.

The Fort Worth Chamber's members include multiple institutions that issue credit cards and are

adversely affected by the challenged regulations.

11.     Plaintiff Longview Chamber of Commerce ("Longview Chamber") is a voluntary representative organization of businesses and professionals who have joined together for the betterment of business, the development of tourism, the development of downtown Longview, and to improve the overall quality of life in Longview. Part of the Longview Chamber's mission is to advocate for its members in a variety of government settings. The Longview Chamber's members include multiple institutions that issue credit cards and are adversely affected by the challenged regulations.

12.     Plaintiff American Bankers Association ("ABA") is the voice of the nation's $23.7 trillion banking industry, which is composed of small, regional, and large banks that together employ more than 2 million people, safeguard $19.6 trillion in deposits, and extend $11.8 trillion in loans. The ABA advocates for banks before Congress, regulatory agencies, and the courts to drive pro-growth policies that help customers, clients, and communities thrive. The ABA's members include large, medium, and small credit card issuers across the country, many of which are subject to and adversely affected by the challenged regulations.

13.     Plaintiff Consumer Bankers Association ("CBA") is the only national trade association focused exclusively on retail banking. Established in 1919, the association is a leading voice in the banking industry and Washington, representing members who employ nearly two million Americans, extend roughly $3 trillion in consumer loans, and provide $270 billion in small business loans. Part of its mission includes representing its members in various government settings. The CBA's members include numerous credit card issuers that are adversely affected by the challenged regulations.

14.     Plaintiff Texas Association of Business ("TAB") is the largest general business association in the state as well as the Texas State Chamber of Commerce. TAB represents

member companies, large and small, to create a policy, legal, and regulatory environment that allows them to thrive in business. TAB's members include numerous institutions that issue credit cards, including some of the nation's largest depository institutions and smaller depository institutions. TAB also has as members retail institutions that offer store-branded credit cards and other consumer financial products. Many of these members are adversely affected by the challenged regulations.

15.    Defendant CFPB is a federal agency in the executive branch and is subject to the Administrative Procedure Act. *See* 12 U.S.C. § 5491(a); 5 U.S.C. § 551(1).

16.    Defendant Rohit Chopra, sued in his official capacity, is the Director of the CFPB.

### JURISDICTION AND VENUE

17.    This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because Plaintiffs' claims arise under federal law.

18.    Plaintiffs U.S. Chamber, Fort Worth Chamber, Longview Chamber, ABA, CBA, and TAB each have associational standing to bring this suit on behalf of their members who are adversely affected by the challenged regulations. Those members would have standing to sue in their own right, the interests at issue are germane to the organizations' missions, and the participation of an individual member is not required.

19.    Each Plaintiff has members who issue credit cards and use late fees to recoup costs associated with late payments, account for the conduct of cardholders who miss payments, deter late payments, and manage their credit card lending businesses in a safe and sound manner. Each Plaintiff has members that entered into existing contractual agreements with customers based upon the existing rules and the express requirements of the CARD Act. If the Final Rule is allowed to take effect, it will significantly limit Plaintiffs' members' ability to deter late

payments and to recoup the associated costs. Without question, some cardholder accounts currently maintained by Plaintiffs' members would never have been opened, or would not have been opened on their particular terms, if the safe-harbor amount for late fees had been capped at $8. And while the Final Rule exempts some members from the safe-harbor decrease, it will nonetheless cause many (if not all) of those members to lower their late fees in order to remain competitive with larger issuers. In addition, the Final Rule limits the costs that all issuers—larger and small—can recover if they choose to adopt a late fee other than the applicable safe harbor amount.

20.     Plaintiffs' larger issuer members also would incur substantial compliance costs. If the Final Rule is allowed to take effect, those members would be forced to amend printed disclosures and credit applications to include new fee information. Members would also need to train customer service agents, compliance officers, and other staff on the new regulations before those regulations became effective, given the short compliance period under the Rule.

21.     Members who decide to use the cost-analysis provisions instead of the safe harbor will incur additional costs to conduct the analysis necessary to justify their late fees to the CFPB. In addition, if a card issuer decides to increase interest rates or make other changes in order to appropriately manage risk and recoup costs—as the CFPB suggests—then that card issuer will need to notify its customers of those changes, incurring substantial costs to do so. Members who offer co-branded cards may also need to negotiate changes in terms with retail partners, which will result in additional costs and complexity. Even announcing these changes may tarnish a card issuer's reputation with consumers.

22.     Each of these harms is directly traceable to the Final Rule, which upends the existing regulations for the credit card industry, and would be remedied by an order enjoining the rule from taking effect and vacating it.

23.     Venue is proper in this district under 28 U.S.C. § 1391(c). Defendants are an agency and an officer of the United States, Plaintiff Fort Worth Chamber resides in this district, a substantial part of the events or omissions giving rise to the claims occurred in this district, and no real property is involved in this action.

## BACKGROUND AND FACTUAL ALLEGATIONS

### I.      The Regulation of Credit Card Late Fees

#### A.      The Truth in Lending Act and the CARD Act of 2009

24.     Congress enacted the Truth in Lending Act ("TILA") in 1968 to make the terms of consumer credit agreements more transparent and thereby enhance competition and the responsible use of credit. *See* 15 U.S.C. § 1601(a). TILA established a regime that is primarily disclosure-based, and credit card late fees have long been part of that regime.

25.     Congress amended TILA in the CARD Act of 2009. In so doing, Congress expressly authorized the Board to create and maintain a regulatory regime that includes late fees. Specifically, the CARD Act added subsection (a) of Section 149 to require that the "penalty fee[s] or charge[s]" that issuers impose "in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee . . . be reasonable and proportional to such omission or violation." CARD Act § 102(b)(1), 123 Stat. 1740 (codified as amended at 15 U.S.C. § 1665d).

26.     Congress directed the Board to promulgate regulations "to establish standards for assessing whether the amount of any penalty fee or charge described under subsection (a) is

reasonable and proportional to the omission or violation to which the fee or charge relates." *Id.* Congress chose to characterize these fees as "penalty fees," conveying that these fees do not merely represent the cost of a transaction but are also intended to deter late payment and account for consumer conduct.

27.     Indeed, Congress had previously considered and rejected a legislative proposal that would have tied late fees to costs alone. *See, e.g.*, Credit Card Accountability Responsibility and Disclosure Act of 2009, S. 414, 111th Cong. § 103 (as reported by S. Comm. on Banking, Hous., & Urb. Affs., Apr. 29, 2009) (emphasis added) (providing that "the amount of any fee or charge that a card issuer may impose in connection with any omission with respect to, or violation of, the cardholder agreement, including any late payment fee, . . . shall be reasonably related *to the cost to the card issuer* of such omission or violation").[9]

28.     In the CARD Act that became law, Congress made clear that cost is only one of several factors that would go into establishing what late fee amount was reasonable and proportional to the violation of paying late. Specifically, in establishing those standards, Congress required the Board to consider "(1) the cost incurred by the creditor from such omission or violation; (2) the deterrence of such omission or violation by the cardholder; (3) the conduct of the cardholder; and (4) such other factors as the Board may deem necessary or appropriate." CARD Act § 102(b)(1), 123 Stat. 1740; *see* 15 U.S.C. § 1665d(c).

29.     Congress also authorized the Board to set a late-fee safe harbor amount for "any penalty fee" "that is presumed to be reasonable and proportional to the omission or violation to

---

[9] Text available at https://www.congress.gov/bill/111th-congress/senate-bill/414/text?s=2&r=1#id657d1b39-583c-42fc-bd02-606c6a55414c.

which the fee or charge relates." CARD Act § 102(b)(1), 123 Stat. 1740; *see* 15 U.S.C.

§ 1665d(e).

    **B.**    **The Federal Reserve's 2010 Regulations**

    30.    The Board implemented this section of the CARD Act by amending its Regulation

Z. *See* Truth in Lending, 75 Fed. Reg. 37526 (June 29, 2010) (codified at 12 C.F.R.

§ 226.52(b)(1)(ii)(A)-(B), now codified in 12 C.F.R. Part 1026).

    31.    The Board initially proposed a mechanism that would use separate criteria to

quantify reasonable and proportional amounts for costs associated with the violation and for

deterring late payments, with an individualized analysis for the cardholder's conduct. *Id.* at

37527.

    32.    The Board ultimately concluded, however, that the best means of accounting for

all of the statutory factors, including deterrence and consumer conduct, was to establish a safe-

harbor maximum of $25, and $35 for subsequent late fees within the next six billing cycles,

which the Board would adjust annually for inflation. *Id.* at 37572; *id.* at 37573 ("the Board has

revised the safe harbors in proposed § 226.52(b)(3) to better address concerns regarding

deterrence and adopted those safe harbors in § 226.52(b)(1)(ii)"); *id.* at 37573-74 ("the safe

harbors in § 226.52(b)(1)(ii) address consumer conduct . . . ").

    33.    The Board found that inflation adjustments would help account for "changes in

issuers' costs and the deterrent effect of the safe harbor amounts." *Id.* at 37543. This was an

unsurprising finding in light of Congress's similar determination in the Federal Civil Penalties

Inflation Adjustment Act of 1990, which recognized that penalty fees must be adjusted for

inflation to ensure that they continue to serve the purposes for which they are levied. Congress's

2015 amendment to that Act requires the Government Accountability Office ("GAO") to

annually review agencies' compliance with the required annual inflation adjustments.[10] For more than a decade, the Board and CFPB directors did not touch that conclusion and followed this commonsense approach.

34.     The Board also established that an issuer could proceed outside the safe harbor and impose a higher fee if the issuer "has determined that the dollar amount of the fee represents a reasonable proportion of the total costs incurred by the card issuer as a result of [the late payment]." 75 Fed. Reg. at 37571 (codified at 12 C.F.R. § 226.52(b)(1)(i)). The Board required the issuer to revisit that determination annually. *Id.*

35.     In addition, the Board clarified that card issuers could not consider losses as part of their costs, "including the cost of holding reserves against potential losses and the cost of funding delinquent accounts." The Board did not generally distinguish among the other types of costs that issuers could recoup, and thereby allowed issuers to factor many types of costs from late payments into their late fees. 75 Fed. Reg. at 37571 (codified at 12 C.F.R. § 226.52(b)(1)(i)).

36.     The Board's cost-based standard did not allow card issuers to take into account the deterrent effects of late fees or other factors relating to consumer conduct, and, indeed, the Board prohibited such consideration. In response to commenters who argued that the CARD Act required the Board's standard to account for deterrence, *see* 15 U.S.C. § 1665(c), the Board responded that it had unbridled discretion: the Act "only requires the Board to *consider* the listed factors. Thus, while these factors provide valuable guidance, the Board does not believe that Congress intended to limit the Board's discretion in the manner suggested by these commenters." 75 Fed. Reg. at 37532 n.18.

---

[10] *See, e.g.*, GAO, Civil Monetary Penalties: Federal Agencies' Compliance with the 2021 Annual Inflation Adjustment Requirements, GAO-22-105596 (Apr 28, 2022), available at https://www.gao.gov/assets/gao-22-105596.pdf.

37.     The Board also responded that it exercised its discretion to use safe harbors "to better address concerns regarding deterrence." *Id.* at 37533. It likewise determined that the safe harbors "address consumer conduct by allowing issuers to impose higher penalty fees on consumers who violate the terms or other requirements of an account multiple times, while limiting the amount of the penalty fee for a consumer who engages in a single violation and does not repeat the conduct for the next six billing cycles." *Id.* at 37533-34.

38.     In essence, the Board claimed adherence to the statute, which required consideration of deterrence and cardholder behavior in the cost-based standard by accounting for deterrence and cardholder behavior in the safe harbor. That approach at least allowed card issuers some mechanism to account for deterrence and cardholder behavior, as mandated by the statute. As discussed below, this approach becomes untenable now that the cost-based formula is further limited, the safe harbor is dramatically lowered, and neither the cost-based formula *nor* the safe harbor amount accounts for deterrence or cardholder behavior.

39.     Congress soon after reassigned the responsibility to regulate late fees to the newly-created CFPB. *See* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, §§ 1061(b)(1)(B), 1100A(2), 124 Stat. 1376, 2036, 2107 (2010). The CFPB adopted the Board's regulations. *See* Truth in Lending (Regulation Z), 76 Fed. Reg. 79768 (Dec. 22, 2011) (now codified in 12 C.F.R. Part 1026); 88 Fed. Reg. at 18908 (describing that standard being in place for a decade). They have been updated eight times for inflation by four different CPFB Directors[11]:

---

[11] *See generally* CFPB, Truth in Lending (Regulation Z) Annual Threshold Adjustments (Credit Cards, HOEPA, and Qualified Mortgages), https://www.consumerfinance.gov/rules-policy/final-rules/truth-lending-regulation-z-annual-threshold-adjustments-card-act-hoepa/ (last visited Jan. 30, 2024) (collecting annual adjustments).

| Safe Harbor (first late fee) | Safe Harbor (subsequent w/in 6 mos.) | Effective | Agency |
|---|---|---|---|
| $25 | $35 | August 22, 2010 through December 31, 2013 | Federal Reserve Board |
| $26 | $37 | January 1, 2014 through December 31, 2014 | CFPB under Director Cordray, appointed by President Obama |
| $27 | $38 | January 1, 2015 through December 31, 2015 | CFPB under Director Cordray |
| $27 | $37 | January 1, 2016 through June 26, 2016 | CFPB under Director Cordray |
| $27 | $38 | June 27, 2016 through December 31, 2016 | CFPB under Director Cordray |
| $27 | $38 | January 1, 2017 through December 31, 2018 | CFPB under Director Cordray |
| $28 | $39 | January 1, 2019 through December 31, 2019 | CFPB under Acting Director Mick Mulvaney, appointed by President Trump |
| $29 | $40 | January 1, 2020 through December 31, 2021 | CFPB under Director Kraninger, appointed by President Trump |
| $30 | $41 | January 1, 2022 through present | CFPB under Director Chopra, appointed by President Biden |
| $8 for larger issuers; $32 for smaller issuers | $8 for larger issuers; $43 for smaller issuers | Permanently for larger issuers upon Final Rule's effective date | CFPB under Director Chopra |

## II.     The CFPB's Current Rulemaking

### A.     The Pre-ordained Rush to Judgment

40.     President Biden's administration targeted so-called "junk fees" for regulation from the start.

41.     Director Chopra took the President's direction and applied it to credit card late fees. In January 2022, the CFPB issued a bulletin characterizing late fees as "junk fees" and arguing that issuers charging the amount presumed reasonable under the CFPB's own regulations were "'herd[ing]' around common amounts, suggesting that competition is ineffective in driving

down price."[12] Just weeks later, the CFPB issued, in the form of a request for information, a call

for consumers to "share their experiences," again characterizing late fees compliant with the

CFPB's own regulations as "junk fees."[13] Director Chopra argued that **"**junk fees often act as

penalties, like with non-sufficient funds and credit card late fees, rather than compensation for a

legitimate service."[14] Indeed, Director Chopra asserted that credit card late fees amounted to

issuers "feast[ing] on their customers through fees."[15] Director Chopra made clear that the

purpose of the request for information was "beginning the process of ending banks' reliance on

these exploitative income streams and making prices and features clearer upfront."[16]

42.     After issuing a report again classifying late fees as "junk fees,"[17] the CFPB issued

an advance notice of proposed rulemaking on June 22, 2022, requesting, among other things,

data on card issuers' costs and the deterrent effects of late fees. Despite receiving several

requests for additional time, its own lengthy delay between Director Chopra's announcement of a

late fee initiative and the advanced notice of proposed rulemaking, and questions by industry on

---

[12] Ashwin Vasan and Wei Zhang, *Americans Pay $120 billion in credit card interest and fees each year*, CFPB Blog (Jan 19, 2022), https://www.consumerfinance.gov/about-us/blog/americans-pay-120-billion-in-credit-card-interest-and-fees-each-year/.

[13] CFPB, *The Hidden Cost of Junk Fees*, CFPB Blog (Feb. 2, 2022), https://www.consumerfinance.gov/about-us/blog/hidden-cost-junk-fees/.

[14] *See* Director Rohit Chopra, *Prepared Remarks of CFPB Director Rohit Chopra on the Junk Fees RFI Press Call* (Jan. 26, 2022), available at https://www.consumerfinance.gov/about-us/newsroom/prepared-remarks-of-cfpb-director-rohit-chopra-on-the-junk-fees-rfi-press-call/.

[15] *Id.*

[16] *Id.*

[17] CFPB, *Credit Card Late Fees,* (Mar. 29, 2022), available at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_credit_card-late-fees_report_2022-03.pdf (last accessed July 23, 2023).

how proprietary information would be treated by the agency, the CFPB gave commenters only

30 days to respond, with a short 10-day extension granted at the end of that 30 days.[18]

43.     On February 1, 2023, less than a week before President Biden's State of the Union

address, his administration announced a raft of new regulations and legislative proposals

designed to fight so-called "junk fees." One of them was the CFPB's proposed changes to its

late-fee regulations.[19]

44.     The CFPB proposed a rule that would reduce the late-fee safe harbor to $8 (for

both first and subsequent late payments), would no longer adjust this amount for inflation, and

would reduce the maximum cap on late fees to 25 percent of the missed minimum payment. *See*

88 Fed. Reg. at 18906. And for card issuers who chose to set late fees above the $8 safe harbor

using the cost-analysis provisions, the proposed rule would still not include consideration of two

of the three mandatory statutory factors and would prohibit them from including post-charge-off

collection costs in setting those fees. (Post-charge-off collection costs are incurred when trying to

collect amounts owed after the issuer has written off an account. *See id.* at 18913.)

45.     The CFPB selected $8 because it "preliminarily determined that a late fee safe

harbor amount of $8 for the first and subsequent violations would cover most issuers' costs from

late payments" and it was concerned that the existing safe harbor amounts "far exceed card

---

[18] Credit Card Late Fees and Late Payments, 87 Fed. Reg. 42662, 42662 (July 18, 2022)
(extending comment period by 10 days). *See also, e.g.*, Am. Bankers Ass'n et al., Request for
Extension of ANPR on Credit Card Late Fees and Late Payments (June 24, 2022), available at
https://www.regulations.gov/comment/CFPB-2022-0039-0002 (requesting 60-day extension of
original 30-day comment period); U.S. Chamber, Comment Letter on Advance Notice of
Proposed Rulemaking 9-10 (Aug. 1, 2022), available at
https://www.regulations.gov/comment/CFPB-2022-0039-0036 (noting that the 40-day comment
period was insufficient).

[19] *See* White House, *Fact Sheet: President Biden Highlights New Progress on His Competition
Agenda*, https://www.whitehouse.gov/briefing-room/statements-releases/2023/02/01/fact-sheet-
president-biden-highlights-new-progress-on-his-competition-agenda/ (Feb. 1, 2023).

issuers' actual pre-charge-off collection costs resulting from late payment violations and thus are not reasonable and proportional." 88 Fed. Reg. at 18916, 18919. The CFPB acknowledged that this change could "increase the frequency of late payments by some percentage, [but] . . . preliminarily determined that some cardholders might benefit from the proposed $8 safe harbor threshold amount in terms of a greater ability to repay revolving debt." *Id.* at 18919. And it suggested that card issuers could facilitate timely payments in other ways, such as through "automatic payment and notification." *Id.*

46.     The CFPB acknowledged that "issuers may respond to this reduction in revenue from late fees by adjusting interest rates or other card terms to offset the lost income," but it did not consider how such adjustments might harm the average American family who carries a balance on their credit card yet makes timely payments. *See id.* at 18922. Instead, the agency touted the benefits only to the subset of consumers who violate the terms of their credit card agreements and pay late. *See id.*

47.     At a White House Competition Council meeting announcing the proposed rule, President Biden decried late fees: "And, folks, that's a junk fee if there ever was one, and it can drain hundreds of dollars a year from the pockets of hardworking American families, especially—especially folks who are already struggling to make ends meet. But not anymore, after today."[20] Director Chopra similarly accused credit card issuers of "exploit[ing] a regulatory loophole that has allowed them to escape scrutiny for charging an otherwise illegal junk fee."[21]

---

[20] White House, *Remarks by President Biden at the White House Competition Council Meeting*, https://www.whitehouse.gov/briefing-room/speeches-remarks/2023/02/01/remarks-by-president-biden-at-the-white-house-competition-council-meeting/ (Feb. 1, 2023).

[21] CFPB, *CFPB Proposes Rule to Rein in Excessive Credit Card Late Fees*, https://www.consumerfinance.gov/about-us/newsroom/cfpb-proposes-rule-to-rein-in-excessive-credit-card-late-fees/ (Feb. 1, 2023).

Of course, the alleged "loophole" was enacted by Congress in 2009, implemented by the Board in 2010, and has been administered by the CFPB for more than a decade since.

48.     Six days later, President Biden touted the proposed rule in his State of the Union address: "My administration is also taking on junk fees, those hidden surcharges too many companies use to make you pay more. . . . We're cutting credit card late fees by 75 percent, from $30 to $8."[22]

49.     In sum, the CFPB launched a request for information that articulated its solution before receiving any feedback from consumers about the alleged problem. The CFPB then announced its Proposed Rule in a joint press conference with the White House, in which the rule was portrayed as a done deal.

### B.     The CFPB's Final Rule

50.     Announced just two days before the 2024 State of the Union, the CFPB's final rule mirrors the President's announcement in substantial part.

51.     Despite the volume of comments pointing out the flaws in its legal and policy analysis, the CFPB's Final Rule maintains an $8 safe harbor for an estimated 95% of credit card accounts, exempts that amount from routine inflation adjustments, and continues to ignore deterrence and cardholder conduct as necessary factors. Although it creates an exemption from this rule for a category it defines as "Smaller Card Issuers," it also fails to explain sufficiently how the same statutory standard—that the fee be "reasonable and proportional to [the] omission or violation" of paying late—could yield drastically different safe-harbor amounts—$8, which

---

[22] White House, *State of the Union Address*, https://www.whitehouse.gov/state-of-the-union-2023/ (Feb. 7, 2023).

never adjusts for inflation, and $32, which does—based solely on the number of open accounts held by an issuer and its affiliates.

### 1.    The CFPB's Flawed Statutory Interpretation

52.    The CFPB finalized an $8 safe harbor with a more limited cost-based standard as the only alternative. Notwithstanding the CARD Act's direction that the CFPB set "standards for assessing whether the amount of any penalty fee . . . is reasonable and proportional to the omission or violation to which the fee or charge relates" (*i.e.*, the late payment), the CFPB adopted standards linked solely to issuer costs (and, indeed, a limited set of such costs). *See* Final Rule 105, 123 (reasoning that "a late fee of $8 for the first and subsequent violations is appropriate to cover pre-charge-off collection costs for Larger Card Issuers on average . . ."). And it made clear in the alternative—*i.e.*, in the circumstance that the $8 fee were enjoined or vacated—that it was separately repealing the existing safe harbor to move to a world in which late fees are based solely on cost analysis. *See* Final Rule at 108–09.

53.    The first flaw in this statutory interpretation is that Congress explicitly authorized issuers to collect a reasonable and proportional "penalty fee" for violations of a cardholder's agreement and a "penalty fee" for a violation is by its plain meaning not solely compensatory. Rather, a penalty fee for a violation both accounts for the conduct of the cardholder and deters the violation; it is analogous to special damages. *See, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003) (noting that special damages are aimed at deterrence); *Tull v. United States*, 481 U.S. 412, 42223 (1987) (explaining in the context of a civil penalty that a penalty may take into account "the seriousness of the violations, the number of prior violations, and the lack of good-faith efforts to comply with the relevant requirements" and "may also seek to deter future violations by basing the penalty on its economic impact"). A "penalty fee" that is

"reasonable and proportional" to the late payment, consequently, is one that not only compensates the issuer but also accounts for the violation of an agreement and deters future late payments. Had Congress intended to set the penalty fee based solely on cost, it would have said "reasonable and proportional to cost" rather than "reasonable and proportional to the . . . violation to which the fee or charge relates." 15 U.S.C. § 1665d(b).

54.     Indeed, the CARD Act confirms as much in its enumeration of what the CFPB must consider in assessing late fees: "(1) the cost incurred by the creditor from such omission or violation; (2) the deterrence of such omission or violation by the cardholder; (3) the conduct of the cardholder; and (4) such other factors as the Bureau may deem necessary or appropriate." 15 U.S.C. § 1665d(c).

55.     Lest there be any doubt, the Durbin Amendment removes it: the same Congress that passed the CARD Act explicitly directed the Board to "establish standards for assessing whether the amount of any interchange transaction fee…is reasonable and proportional *to the cost incurred by the issuer* with respect to the transaction." 15 U.S.C. § 1693o-2(a)(3)(a) (emphasis added). In the interchange fee rule writing directive, Congress directed the Board to set a standard that is "reasonable and proportional to the cost incurred by the issuer." By contrast, for purposes of credit card late payment fees, the same Congress directed the CFPB to set a standard that is "reasonable and proportional to the violation or omission," and then directed the CFPB to consider additional factors including cost, deterrence, and cardholder conduct. Accordingly, the CFPB's standards for late fees must be based on more than simply the issuer's costs.

56.     Yet the CFPB combined a specific cost-analysis standard with a safe harbor set at $8 because that amount "is appropriate to cover pre-charge-off collection costs." Final Rule 123.

In sum, the CFPB has replaced the statutory authorization that issuers may collect a penalty fee that is reasonable and proportional to the late payment violation with a regime in which issuers may collect a fee that is reasonable and proportional to (a limited set of) issuer costs.

57.     To be sure, the CFPB did discuss deterrence in setting the safe harbor amount: it claimed that lowering the safe harbor would not wholly undermine any deterrent effect of late fees, although it may lower it by an indeterminate amount. Final Rule 125. This conclusion is at odds with the overwhelming weight of empirical evidence relating to the deterrent effect of fees, and it was made with no understanding of the actual effect the rule will have on deterrence. *Id.* ("the CFPB determines that the available evidence for Larger Card Issuers suggests that an $8 safe harbor amount will have a deterrent effect on late payments") (emphasis added); *id.* at 140 ("the CFPB finds that the available evidence and the CFPB's study of the Y-14 data of certain Larger Card Issuers indicate that the $8 safe harbor amount for the first and subsequent late payments will still have a deterrence effect on late payments, although that effect may be lessened to some extent, and other factors may be more relevant (or may become more relevant) toward creating deterrence"). In addition, the CFPB's rule turns the CARD Act's requirements on their head: the safe harbor amount must be reasonable and proportional in part because such fees are necessary to deter future violations. It is not enough to assert that because the promulgated safe harbor has a nonzero deterrent effect, it adequately reflects a "reasonable and proportional" penalty fee that accounts for deterrence. A fee of one dollar, or even one cent, would arguably meet a nonzero deterrence test. But the CFPB's theory of "well, a fee at some level is better than nothing" is obviously inconsistent with the statute. It also falls short of the requirement that rulemaking be based on credible and verifiable evidence and reasoned analysis.

58.     This flaw of statutory interpretation is particularly pronounced in the context of cardholders who repeatedly pay late. As the Board recognized in its 2010 Final Rule, a repeat violation is a "more serious form of consumer conduct than a single violation," 75 Fed. Reg. at 37526, so a penalty fee that is "reasonable and proportional" to the violation should be higher for a repeat offender. Yet the CFPB, unlike the Board, concluded that the penalty should be the same. This conclusion was based on no meaningful evidence or analysis, but simply the CFPB's belief that consumers do not understand or process higher late fees for subsequent violations. Final Rule 130. The Board had previously found that "multiple violations during a relatively short period can be associated with increased costs and credit risk." 75 Fed. Reg. at 37526. The Final Rule does not adequately refute or suggest that this finding is no longer correct.

59.     The second flaw in the CFPB's interpretation of the CARD Act is the agency's attempt to treat the safe harbor as merely an alternative to the cost-based standard rather than part of the Board's integrated standard for late fees. The CFPB presumed that card issuers could implement late fees outside of the new safe harbor if their costs warrant it, the implication being that, even if the CFPB was unreasonable in lowering the safe harbor to $8, it would make little difference. Indeed, the CFPB doubled down on this presumption by noting that it was separately repealing the existing safe harbor such that if its preferred $8 safe harbor were enjoined or vacated, issuers would be left to set late payments in accordance with the cost-based standard. *See* Final Rule at 108–09. But the Board adopted the existing standard only because the safe harbor adequately captured some of the statutory considerations that the cost-based analysis did not (but should have). *See* 75 Fed. Reg. at 37533. The Board ignored deterrence and cardholder conduct in the cost-based standard, and the CFPB has now removed those considerations from the safe harbor. The CFPB's Final Rule thus dramatically alters the existing regulatory

framework for late payments. And even if the cost-based standard could be considered in isolation from the safe harbor, the Final Rule alters the financial stakes of the Federal Reserve's 2010 rule, rendering the cost-based standard more relevant and operative and thus its statutory flaws, which are the same as those enumerated above, more significant.

60.     The CFPB compounded this error by turning the concept of the safe harbor on its head. Instead of treating the safe-harbor amount as presumptively legal, it treats fees above the safe-harbor amount as presumptively illegal.[23] And because the CFPB justifies its safe harbor with categorical statements about issuer costs, the Final Rule casts doubt on whether the agency will ever find a higher amount permissible by allowing for consideration of the other mandatory statutory factors. This makes the baseline safe-harbor amount even more important, especially given the Biden Administration's indications that it intends to enforce its limitations on late fees aggressively.

61.     The third flaw in the CFPB's statutory interpretation is that the CFPB restricted its already myopic focus on costs to "pre-charge-off collection costs," both in the cost-based standard (which the CFPB purports to "clarif[y]" but leave unchanged) and in repealing the old safe harbor and setting the new one based on its assessment of issuers' costs. As several commenters explained, the exclusion of post-charge-off collection costs is inconsistent with Congress's instruction that the CFPB consider "the cost incurred by the creditor." 15 U.S.C. § 1665d(c). Collection costs, whether pre- or post-charge-off, are all incurred by the creditor as a result of the omission or violation at issue—the late payment. And a reasonable and proportional penalty fee must allow those costs to be recouped.

---

[23] *See, e.g.*, Final Rule 104 ("the CFPB has determined that the existing safe harbors . . . are too high to be "reasonable and proportional"").

62.    The CFPB describes this change as a "clarification" to commentary contained in Regulation Z. Final Rule at 5. But, despite its placement in commentary, this "clarification" effects a new legal requirement. Regulation Z permits card issuers to include all—or, to quote the regulation, "total"—costs associated with a late payment, with the exception of losses and the cost of reserving for such losses. These total costs would include all collection costs, including those associated with accounts after charging off, plus a variety of other non-collection costs associated with late payments that the CFPB now attempts to exclude. The change in commentary thus effects a change in issuers' legal requirements.

### 2.    The CFPB's Flawed Reliance on Non-Public Data

63.    The flaws in the CFPB's Final Rule are not just statutory. To justify its new framework (and its premise that $8 is sufficient to cover the average issuer's pre-charge-off collection costs), the CFPB relied on analysis of non-public data from the Board's Capital Assessments and Stress Testing survey ("Y-14M data"), which (since 2021) collects data from financial holding companies with at least $100 billion in assets.[24] Specifically, the CFPB appears to have analyzed a subsample of data reported on line 32 of Schedule D.2 of the Y-14M survey, which provides the following instruction to responding banks: "Report costs incurred to collect problem credits. Include the total collection cost for delinquent, recovery, and bankrupt accounts."[25] The Board provides no additional guidance on what should be included or excluded when calculating and reporting that amount. There is no standardization, and it is up to each filer

---

[24] *See* Federal Reserve Board, *Reporting Forms: FR Y-14M*, https://www.federalreserve.gov/apps/reportingforms/Report/Index/FR_Y-14M (last updated Oct. 12, 2022). The Y-14M now includes data only from holding companies with at least $100 billion in assets. *See id*.

[25] Federal Reserve Board, *Instructions for the Capital Assessments and Stress Testing Information Collection* 186 (modified Sept. 2022), available at https://www.federalreserve.gov/apps/reportingforms/Report/Index/FR_Y-14M.

to use its best judgment. Because the information provided is a single totaled number for each category, the CFPB lacks the data to understand whether the factors supporting those totaled numbers are consistent between banks, whether different banks include different factors in different categories, or exactly what costs a bank is including and not including in its numbers.

64.     Several commenters explained how the CFPB's reliance on the Y-14M data—which are collected to aid the Board's stress-test models and not to provide detailed cost data—likely caused the CFPB to significantly understate the true costs associated with late payments. For example, Plaintiff ABA reported that, due to ambiguity in the Y-14M instructions, its members do not consistently include on line 32 all costs (such as shared, fixed, or overhead costs) properly attributable to late payments.[26] That large banks do not agree on the costs reported in the Y-14M data indicates not only that the CFPB's reliance on the data is flawed but also that the industry does not operate under a consistent definition of collection costs. The CFPB did not sufficiently address these comments.

65.     The Y-14M data also include only collection costs for delinquent, recovery, and bankrupt accounts, which do not appear to include costs associated with late payments that do not become delinquent (*i.e.*, that become current within 30 days), such as costs incurred for customer service representatives to speak to customers seeking information about their late payment or requesting fee waivers. Nor do these data necessarily account for costs not directly related to collections, such as the costs incurred to respond to customer service inquiries stemming from late payments (such as salaries, IT costs, and general overhead). The CFPB did not sufficiently explain why those costs should be excluded, nor did it sufficiently address

---

[26] Am. Bankers Ass'n et al., Comment Letter to CFPB 15 n.47 (May 3, 2023), available at https://www.regulations.gov/comment/CFPB-2023-0010-0192.

comments explaining why they should be included. Nor did the CFPB offer a reasonable interpretation of its statutory mandate—that it consider "cost[s] incurred by the creditor," 15 U.S.C. § 1665d(c)—that would allow it to exclude these, or post-charge-off costs, from consideration, or to conclude that a fee including such costs was not "reasonable and proportional" to the violation. Nor did the CFPB adequately explain how its own regulation that allows for recovery of "total costs" could reasonably be limited to only one type of cost incurred in collections.

66.     Finally, the limited timeframe that the CFPB appears to have used for its analysis of the Y14M data likely understates the volatility of card issuers' cost-to-fee ratios pertaining to late fees, which can change substantially over time depending on economic conditions and other factors. In particular, the CFPB relied on data from 2016 to 2022, a period of relatively low credit card delinquency. In such periods, issuers enjoy lower collection costs. Consequently, the CFPB's analysis is based in part on a time period that would underestimate issuers' collection costs.[27]

67.     It is possible that the CFPB's analyses of the Y-14M data were flawed in additional ways (for example, larger issuers tend to lend to customers with better credit scores), but it is impossible to know, as those data (and much of the analysis) are non-public. Moreover, requests to make some culled down or redacted version of the information available were ignored by the CFPB, and it failed to provide sufficient technical details of its analyses to allow

---

[27] See generally Bank Policy Institute, The CFPB's Deeply Flawed Proposed on Credit Card Late Fees – Part 3: Significant Errors in the CFPB's Cost-Based Calculation of the Safe-Harbor Limit, https://bpi.com/the-cfpbs-deeply-flawed-proposal-on-credit-card-late-fees-part-3/ (Jun 6, 2023).

for public scrutiny. In the Final Rule, the CFPB did not meaningfully address the many comments pointing out these and other flaws in the CFPB's data analysis.

68.     The CFPB relied on Y-14M data instead of providing the industry with meaningful time to respond to its request for data.

### 3.     The CFPB's Flawed Reasoning

69.     Had the CFPB properly interpreted the statute and relied on appropriate data, it would have had to conclude that the new standard does not in fact allow for the recovery of a "reasonable and proportional" penalty fee. Strong empirical evidence, including peer-reviewed research, suggests that reducing late fees to $8—the amount that the CFPB believes would allow issuers to recover a subset of their costs—would significantly increase the incidence of late payments.[28] In its rush to promulgate a rule, the CFPB summarily disregarded these peer-reviewed studies in favor of its own internal study, which relied on confidential data that could not be subjected to scrutiny during the comment period.

70.     The CFPB took the position that "the prevalence of late payments is not highly sensitive to the level of late fees at the current order of magnitude," but its only support for that position was a flawed analysis from of a subset of the largest issuers (the Y-14M data) asking whether cardholders who paid late were more likely to pay on time seven months later, when the maximum fee was $30, compared to six months later, when the maximum fee was $41. Final Rule 130.

---

[28] See, e.g., Daniel Grodzicki et al., Consumer Demand for Credit Card Services, J. of Fin. Servs. Res. (Apr. 2022); Daniel Schwartz, The Rise of a Nudge: Field Experiment and Machine Learning on Minimum and Full Credit Card Payments, in NA – Advances in Consumer Research, Volume 49 (Tonya Williams Bradford et al., eds., 2021); John Gathergood et al., How Do Consumers Avoid Penalty Fees? Evidence From Credit Cards, SSRN (Dec. 2019); Sumit Agarwal et al., Learning in the Credit Card Market, NBER (Apr. 2013).

71.     As several commenters pointed out, this analysis was seriously flawed. Whether a cardholder who has already paid late will miss another payment after the fee drops from $41 to $30 is an entirely different question from whether a cardholder who has not previously paid late will miss a first payment after the fee drops from $30 to $8. The cardholders are different (one has already incurred a late fee and the other has not); the reductions are different (an $11 reduction versus a $22 reduction); and the magnitudes of the late fee are different ($30 versus $8). Assuming that the incentive effects are equivalent in these circumstances is a fundamental—and fatal—analytical flaw.

72.     In addition, the CFPB presumed that card issuers could implement late fees outside of the new safe harbor if their costs warrant it. The implication of that assumption is that even if the CFPB erred in lowering the safe harbor to $8, it would make little difference. But this conclusion understates the costs card issuers will incur to determine (and potentially defend) a cost-based late fee outside of the safe harbor (costs that the CFPB never seeks to quantify), understates the benefits of certainty– both for issuers and consumers – that come with a card issuer's ability to rely on the safe harbor, and entirely removes the concepts of deterrence and cardholder conduct from the analysis.

### 4.     The Arbitrary Treatment of Larger Issuers

73.     The CFPB also acted arbitrarily in its treatment of larger card issuers in at least two respects. First, the CFPB does not explain how it derived its cut-off between larger and smaller issuers, which is one million cards in circulation throughout the preceding year. And the difference in treatment of larger issuers is dramatic, with the CFPB lowering the safe harbor for such issuers by 75 percent.

74.     Second, the CFPB provides no explanation for why there is any reason to think that a "penalty fee" is reasonable and proportional to the violation of paying late when one obtains one's credit card from an issuer with less than one million open credit card accounts but not when one obtains a credit card from an issuer with more than one million open credit card accounts.  Even assuming that smaller issuers have some differences in their ability to recoup costs due to different economies of scale, the statutory language is keyed to the violation, not solely to costs.  And nothing in the CARD Act suggests that the CFPB is authorized to maintain standards for penalty fees that account for all of the penalty factors for one subset of issuers but not for another.

**5.      Insufficient Time for Implementation: The CFPB Seeks to Ignore the Effective Date Requirements in TILA**

75.     TILA requires that any CFPB regulation, "or any amendment or interpretation thereof, requiring any disclosure which differs from the disclosures previously required" by TILA "shall have an effective date of that October 1 which follows by at least six months the date of promulgation." 15 U.S.C. § 1604(d). The Final Rule violates that requirement by making the Final Rule effective 60 days after its publication in the Federal Register. By changing the maximum late fee that a card issuer can charge, many card issuers will be required to update their disclosures, requiring an October 1, 2024, effective date. The Final Rule's effective date is thus unlawful.

76.     The CFPB contends that the *general* statutory standard for disclosures will not change and that issuers do not have to rely on the safe harbor. However, the CFPB concedes that it is unaware of any issuer that uses the cost-based standard instead of relying on the safe harbor, *see* Final Rule at 10,11, and it is indisputable that many such issuers will have to lower their late fee and change their disclosures. Even where issuers do not rely on the safe harbor, the CFPB's

narrowed definition of costs will nevertheless require an update to their disclosures to reflect the lowered cost-based fees based upon the new guidance. Thus, this is a classic case of the CFPB "requiring any disclosure which differs from the disclosures previously required." 15 U.S.C. § 1604(d).

77.     The Rule's effective date also affords insufficient time for issuers to implement its requirements. The Rule presumes that card issuers could implement late fees outside of the new safe harbor if their costs warrant it. Notably, however, the CFPB's expedited timeline effectively precludes any issuer from being able to engage in any cost-assessment based upon the rule's new guidance in sufficient time to leverage a cost-based late fee outside of the safe harbor before the rule comes into effect. *See* Final Rule at 219 (acknowledging that "Larger Card Issuers may choose to initially adopt the $8 late fee safe harbor amount while separately conducting a more extensive cost analysis"). As a result, the CFPB is forcing issuers to adopt an $8 late fee, notwithstanding its claims to the contrary.

## III.     The CFPB's Unconstitutional Funding Structure

78.     Given the CFPB's deviation from Congress's directives in the CARD Act with this Rule, it is perhaps unsurprising that the CFPB has a unique structure and unique relationship to Congress. The CFPB's structure has already been found unconstitutional by the Supreme Court in one respect. *See Seila Law LLC v. CFPB*, 140 S. Ct. 2183 (2020).

79.     By statute, the CFPB is not funded by periodic appropriations from Congress. Rather, it has a "self-actualizing, perpetual funding mechanism," by which it draws money directly from the Federal Reserve, which draws money from industry. *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 638 (5th Cir. 2022) (citing 12 U.S.C. § 5497(a)), *cert. granted*, 143 S. Ct. 978 (2023). The Fifth Circuit has ruled that this funding structure violates the

Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, and has vacated agency rulemaking that was funded through this mechanism. *Cmty. Fin. Servs. Ass'n*, 51 F.4th at 643.

80.     The CFPB's rulemaking efforts related to the Final Rule, and the earlier Advance Notice of Proposed Rulemaking, 87 Fed. Reg. 38679 (June 29, 2022), and Notice of Proposed Rulemaking, 88 Fed. Reg. at 18906 (Mar. 29, 2023), were funded using money drawn through this unusual mechanism that the Fifth Circuit has already held to be unconstitutional. *See Cmty. Fin. Servs. Ass'n*, 51 F.4th at 643.

## IV.     Implementation of the Final Rule Would Cause Irreparable Harm

81.     For over a decade, card issuers throughout the United States relied on the safe-harbor amounts in setting late fees above $8. According to the CFPB's own review of 538 credit card agreements, at least 93 percent have late fees exceeding $8.[29]

82.     Plaintiffs leveraged the existing safe harbor amounts to provide greater clarity and certainty for their customers, while also providing valuable compliance certainty. The safe harbor adequately addressed cardholder conduct and deterred late payments, and it allowed issuers to avoid the significant expense of performing the yearly cost-justification studies that would otherwise be required under Regulation Z.

83.     Plaintiffs' members are suffering and will continue to suffer irreparable harm if the Final Rule becomes effective, including, but not limited to:

> a.     Millions of dollars in losses within the first several years of going into
> effect, including losses on accounts that never would have been issued if

---

[29] CFPB, *Credit Card Late Fees* 15 (Mar. 2022), available at https://s3.amazonaws.com/files.consumerfinance.gov/f/documents/cfpb_credit-card-late-fees_report_2022-03.pdf

there had been (or if issuers knew there later would be) an $8 safe harbor. These losses could not be recovered even if the Final Rule is later vacated.

b.  Significant compliance costs for those members subject to the Final Rule, including costs from needing to (1) prepare, print, and distribute new disclosures to millions of applicants and new customers that reflect the revised late fee terms; (2) update mandated subsequent disclosures to millions of existing card customers reflecting the revised terms, including late-payment warnings on statements and pricing information included on or with credit card agreements and provided upon renewal of a credit card; and (3) update computer systems to implement a new late fee amount.

c.  Costs to train customer service agents, compliance officers, and other staff on the new regulations, including the development of training materials for thousands of employees, at a cost of millions of dollars in employee time.

d.  Costs stemming from the reduced deterrence effect and consequential increase in late payments, including overhead and staffing costs related to collections and related customer-service contacts, as well as increased losses and lost-opportunity expenses for the increased mandatory loss provisions and reserves required for higher rates of delinquency.

e.  Loss of customer goodwill if issuers are forced to change other terms and conditions to offset the effects of lowered late fees, in addition to the substantial costs of implementing those new terms.

84.     Director Chopra has sought to downplay the irreparable harm caused by the Final Rule, arguing that issuers can set late fees outside of the safe harbor "based on their costs and other factors."[30] But the Final Rule's accelerated timeline, in violation of TILA, makes that implausible. *See* Final Rule at 219 (directing that "if Larger Card Issuers choose to use the cost analysis provisions . . . , including the requirement to exclude post-charge off collection costs from its analysis, they must do so and comply with the changes in this final rule by this final rule's effective date").

85.     The reality is that the expedited timeline effectively ensures that Plaintiffs' members have only one choice—the $8 safe harbor. The 60-day timeline is insufficient to conduct the cost-based analysis otherwise required and to disclose the resulting fee to customers. Even a cost-based approach under the CFPB's narrowed guidelines would irreparably harm Plaintiffs' members by excluding post-charge-off collection costs.

**CLAIMS FOR RELIEF**

**COUNT I**
**U.S. Constitution**
**(Violation of the Appropriations Clause, Separation of Powers)**
U.S. Const. art I, § 9, cl. 7

86.     Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

87.     By funding the rulemaking at issue with money drawn from the Federal Reserve pursuant to 12 U.S.C. § 5497(a), the CFPB acted in violation of the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, and the separation of powers, and the resulting rulemaking must be set

---

[30] Kate Berry, *CFPB's Chopra: "It's Very Profitable to Have Customers Be Late*," American Banker (July 20, 2023), https://www.americanbanker.com/news/cfpbs-chopra-its-very-profitable-to-have-customers-be-late (emphasis added).

aside under the Administrative Procedure Act, 5 U.S.C. § 706. *See Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 638 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 978 (2023).

**COUNT II**
**Administrative Procedure Act**
**(Violation of the CARD and Dodd-Frank Acts)**
5 U.S.C. § 706

88.     Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

89.     By repealing the old safe harbor and establishing a new safe-harbor amount based on only a fraction of the costs incurred by issuers from late payments, and not allowing issuers to charge fees that sufficiently account for deterrence or consumer conduct, including with respect to repeat violations, the Final Rule violates the express requirements of the CARD Act, 15 U.S.C. § 1665d.

90.     By allowing credit card issuers to consider only a subset of their costs in setting late fees above the safe harbor, the Board, and now the CFPB, have failed to follow the requirements of the CARD Act, 15 U.S.C. § 1665d. The CFPB either directly reopened the cost-analysis provisions in the Final Rule, or it constructively reopened consideration of those provisions by so fundamentally altering the nature of those regulations that the change could not have been reasonably anticipated.

91.     By failing to consider sufficiently the likely costs to consumers of the Final Rule, including the reduced access to credit for some consumers, the CFPB did not meet the standards for rulemaking under the Dodd-Frank Act, 12 U.S.C. § 5512, which requires, among other things, that the CFPB consider "the potential benefits and costs to consumers and covered persons, including the potential reduction of access by consumers to consumer financial products or services resulting from such rule," *id.* § 5512(b)(2)(A)(i).

92.     For each of these reasons, the Final Rule must be set aside under the Administrative Procedure Act, 5 U.S.C. § 706.

## COUNT III
### Administrative Procedure Act
### (Arbitrary and Capricious Decision Making)
5 U.S.C. § 706

93.     Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

94.     The CFPB did not reasonably and rationally analyze or explain its decisions, nor did it base those decisions on substantial evidence. For example, the CFPB used inappropriate, incomplete, and non-public data to estimate card issuers' costs; it used deeply flawed analysis to dismiss concerns about the decreased deterrent effect of reducing late fees to $8; it underestimated the expected increases in card issuer costs from the resulting increases in late payments; it did not explain sufficiently its basis for no longer adjusting certain safe-harbor fee amounts for inflation; it arbitrarily and irrationally excluded post-charge-off collection costs, and other costs, from the costs that card issuers are permitted to recover through late fees; and it understated the costs to card issuers of implementing late fees outside of the new safe harbor. When acknowledging that its rule may not permit all issuers to recover the costs they incur from late payments, the CFPB simply asserted that issuers could recover these costs through changes to their interest rates and other fees, without adequately considering whether a market with higher interest rates and annual fees, and reduced access to credit for some higher-risk consumers, is a better market for those consumers than the one that has prevailed for the last decade. It also failed to provide a satisfactory explanation for why the same statutory limitation—that late fees should be reasonable and proportional to the violation of paying late— would vary by the number of accounts opened by the issuer, or why adjustments for inflation should apply to the safe harbor amounts for smaller issuers but not for larger ones.

95.     To the extent it acknowledged and addressed the requirements for its rulemaking under the Dodd-Frank Act, the CFPB failed to explain sufficiently and rationally the reasoning behind its decisions not to follow them, as required by the Administrative Procedure Act. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

96.     The CFPB also failed to provide a rational explanation for the change in the government's position from the 2010 Rule with respect to costs. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) ("[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it is changing position.").

97.     The CFPB also failed to recognize that its interpretation of "cost" is inconsistent with the text of the 2010 regulations.

98.     Consequently, the CFPB violated the Administrative Procedure Act by failing to engage in reasoned decision making, failing to explain its reasoning sufficiently, and failing to support its conclusions with substantial evidence. The Final Rule must be set aside. 5 U.S.C. § 706.

## COUNT IV
### Administrative Procedure Act
### (Failure to Make Data Available for Public Comment)
### 5 U.S.C. § 553

99.     Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

100.    The CFPB had the duty under the Administrative Procedure Act to publish its proposed rulemaking and give the public a meaningful opportunity to comment. "Integral to these requirements is the agency's duty to identify and make available technical studies and data that it has employed in reaching the decisions to propose particular rules . . . . An agency

commits serious procedural error when it fails to reveal portions of the technical basis for a proposed rule in time to allow for meaningful commentary." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 199 (D.C. Cir. 2007) (cleaned up).

101.    The CFPB substantially based its decisions on its analysis of a subsample of the Federal Reserve's Y-14M data, which are not publicly available and has not been made available by the CFPB. The CFPB has not attempted to anonymize these data or produce summaries for public inspection or comment, nor has it provided all the necessary details underlying its statistical conclusions. Considering the importance of the Y-14M data to the CFPB's conclusions, the failure to make the data publicly available in at least an anonymized form violated the Administrative Procedure Act, and the Final Rule must be set aside. 5 U.S.C. § 706.

102.    The CFPB likewise relied upon new data that was not made available to the public for comment. *See, e.g.*, Final Rule at 12, 46–50.

**COUNT V**
**Administrative Procedure Act**
**(Violation of TILA's Effective-Date Provision)**
5 U.S.C. § 706

103.    Plaintiffs repeat and incorporate by reference all of the foregoing allegations.

104.    Under TILA, CFPB regulations that require new consumer-credit disclosures must have an October 1 effective date that is at least six months after the promulgation of the Final Rule. 15 U.S.C. § 1604(d).

105.    The Final Rule was promulgated on March 5, 2024, and will become effective 60 days after its publication in the Federal Register, which will likely precede October 1, 2024.

106.    The Final Rule requires new consumer-credit disclosures, and so TILA requires that its effective date be no sooner than October 1, 2024.

107.    The Final Rule's effective date thus violates TILA and must be set aside as unlawful under the Administrative Procedure Act. 5 U.S.C. § 706.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully request that this Court enter judgment in their favor and award the following relief:

a.  A declaration that the CFPB's Final Rule is arbitrary, capricious, or otherwise contrary to law within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706;

b.  An order vacating and setting aside the Final Rule in its entirety;

c.  An order issuing all process necessary and appropriate to stay the effective date and enjoin the implementation of the Final Rule pending the conclusion of this case;

d.  To the extent the CFPB's Final Rule is not vacated and enjoined in its entirety, a declaration that the CFPB's provisions purporting to repeal the safe harbor for Larger Issuers and replace it with an $8 safe harbor, without providing an avenue for Larger Issuers to take into account all factors required by CARD Act, 15 U.S.C. § 1665d, are arbitrary, capricious, or otherwise contrary to law within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706, and an order vacating and setting aside those provisions;

e.  To the extent the CFPB's Final Rule is not vacated and enjoined, a declaration that the cost-analysis provisions are arbitrary, capricious, or otherwise contrary to law within the meaning of the Administrative Procedure Act, *see* 5 U.S.C. § 706, and an order vacating and setting aside that provision in its entirety;

f.  To the extent the CFPB's Final Rule is not vacated and enjoined, a declaration

    that the CFPB's effective date must be revised and an order implementing a

    proper effective date;

g.  An order awarding Plaintiffs their reasonable costs, including attorneys' fees,

    incurred in bringing this action; and

h.  Any other relief that the Court deems just and equitable.


Dated: March 7, 2024                          Respectfully submitted,

                                               /s/ Michael Murray
                                              Michael Murray
                                              D.C. Bar No. 1001680
                                              *Application for pro hac vice forthcoming*
                                              michaelmurray@paulhastings.com
                                              Tor Tarantola
                                              D.C. Bar No. 1738602
                                              *Application for pro hac vice forthcoming*
                                              tortarantola@paulhastings.com
                                              PAUL HASTINGS LLP
                                              2050 M Street NW
                                              Washington, DC 20036
                                              (202) 551-1730

                                               /s/ Derek Carson
                                              Philip Vickers
                                              Texas Bar No. 24051699
                                              pvickers@canteyhanger.com
                                              Derek Carson
                                              Texas Bar No. 24085240
                                              dcarson@canteyhanger.com
                                              CANTEY HANGER LLP
                                              600 West 6th Street, Suite 300
                                              Fort Worth, TX 76102
                                              (817) 877-2800

                                              ***Attorneys for Plaintiffs***

Thomas Pinder
D.C. Bar No. 451114
*Application for pro hac vice forthcoming*
tpinder@aba.com
Andrew Doersam
D.C. Bar No. 1779883
*Application for pro hac vice forthcoming*
adoersam@aba.com
AMERICAN BANKERS ASSOCIATION
1333 New Hampshire Ave. NW
Washington, DC 20036

***Attorneys for Plaintiff American Bankers
Association***


Jennifer B. Dickey
D.C. Bar No. 1017247
*Application for pro hac vice forthcoming*
Jdickey@uschamber.com
Maria C. Monaghan
D.C. Bar No. 90002227
*Application for pro hac vice forthcoming*
mmonaghan@uschamber.com
U.S. CHAMBER LITIGATION CENTER
1615 H Street NW
Washington, DC 20062

***Attorneys for Plaintiff Chamber of
Commerce of the United States of America***